Today and this week's calendar which is United States v. Bentz. Counsel will come forward. May it please the court, my name is Bruce Locke and I'm here representing Mr. Bentz. I was here on Wednesday complaining that the government was putting in evidence in the Kiles case, putting in evidence that they shouldn't have put in. I'm here now complaining that the government didn't give us, didn't give defense counsel information that it should have given prior to the trial in this case. The issue in this case was Mr. Bentz testified that he ran a company. The company had a pension plan. The pension plan was at a bank, invested in a bank. The bank was paying 2% interest on the pension fund. His accountant came to him, Mr. Peters, came to him and said, you could invest that pension fund with a client of mine, Dr. Chan, and Dr. Chan will pay 8% on the money. Not only that, Dr. Chan will loan you, loan your company an amount equivalent to the pension fund at 11%. Mr. Bentz testified that that seemed like a good thing to do to him and that's what he did. Mr. Peters, the accountant, who was indicted with Mr. Bentz at the beginning but who had to deal with the government to testify against Mr. Bentz, testified that that transaction occurred, but that he told Mr. Bentz at the beginning that the transaction was illegal. So the case comes down to, do you believe Mr. Bentz, that Mr. Peters told him that what they were doing was legal, or do you believe Mr. Peters, who said, no, I told Mr. Bentz up front that what we were doing was illegal. The information that was withheld from the defense was that at about the time this transaction was going on, Mr. Peters testified in front of a federal grand jury in Sacramento that was investigating a tax fraud scheme. The tax fraud scheme involved Mr. Chappell, Mr. Goodrich, and Mr. Gaskell, who were convicted of tax fraud, and it was a foreign trust scheme. It was a scheme where doctors or highly paid people put their business into a trust, the money goes funneling through foreign trusts and theoretically comes back tax free. Mr. Peters, in his grand jury testimony, testified that he prepared tax returns for Dr. Pick and Dr. Hoffer, in which those gentlemen earned between $300,000 and $400,000, and the tax returns reflected that there was no taxable income. In fact, one of the doctors actually claimed an earned income credit back from the government. Mr. Peters testified in his grand jury testimony that the reason he got involved in that scheme was because he was trying to build up his practice. He wanted to generate more clients, and he thought he could get clients referred to him by Gaskell, Goodrich, and Chappell, the promoters of this plan. That information clearly, that grand jury testimony, clearly establishes that Mr. Peters was engaged in tax fraud, in that he was the preparer of the fraudulent returns. At the trial of Gaskell, Goodrich, and Chappell, the government relied on tax returns of three doctors, Dr. Pick, Dr. Hoffer, and another doctor. Those were the basis of the case that resulted in the conviction of those three people. Mr. Peters was not prosecuted, nor were the doctors who filed the returns. They weren't prosecuted either. What's the time comparison here? The returns that he prepared for the doctors were 1995 returns, so they would have been prepared in 1996, but he testified in the grand jury that he started working for the doctors in mid-1995. The transaction here takes place in April of 1995, April-May of 1995. So he's doing the work for Mr. Bentz, and three or four months later he's working for these other individuals. And then later, about a year later, probably April or May of 1996, he prepares the 1995 returns. And your argument is that the connective relevance, if you will, between the two, is that his nearly contemporaneous participation in a tax fraud scheme is highly relevant to his testimony that he told your client, Bentz, that this transaction was illegal. Yes. One, participation in a tax fraud scheme shows that you're a liar and a thief, and that's clearly impeachment of Mr. Peters. It could have been brought out in the trial if we'd known about it. In addition, he testified that his motive in the tax case was to generate more clients. He is the Arthur Anderson of a one-man practice. He's, you know, if you do stuff for, you know, you get things going for clients that they can't get done any other way, you get to earn more money. And that's what he was doing. Was there any other testimony in Bentz' trial about Peters being aware, I mean, about Bentz being aware of the illegality of the transaction? No. I mean, this is the only direct testimony. Only direct testimony. If you look at the government's brief, pages 11 through 14, it's their statement of facts, and it says Peters testified, Peters testified, Peters testified, according to Peters, according to Peters, according to Peters. Peters is the only witness as to what he told Bentz. And that makes it crucial. He is the key to this. Peters is the key to this case. And Mr. Bentz had a right to bring out the information about Peters being a liar and a thief, and it had the right to bring out the information about Peters being a liar and thief. What in his grand jury testimony would demonstrate that Peters was a liar and thief? Well, it's that he's a tax evader, which is the equivalent of a liar. He was a tax evader, or he had clients who participated in this trust scheme that turned out to be a tax fraud. Well, he prepared their tax returns, and you can't, you could not prepare those tax returns without being criminally liable. The big jump from saying liar and thief to testimony that included statements by him that he relied upon the tax attorney, he had his own doubts about the scheme and tried to do some research, ultimately relied upon a tax attorney. Now, I have no doubt that there's some black marks on his record from the grand jury testimony, but liar and thief seems to be kind of a stretch from what he said to the grand jury. Your Honor, Judge Burrell tried the Gaskell Chapel and Goodrich case. I represented Goodrich in that case. There is, and Judge Burrell did not, he implicitly found that this was impeachment. He didn't make a specific finding that it was impeachment, but every reason he gave for not granting the new motion assumes that this evidence is impeaching. You cannot, one could not prepare a tax return for a doctor that's making between $300,000 and $400,000 and claim an earned income credit on it or have zero tax liability and claim that one is acting legally. It is impossible. You can't get there, and certainly not through this tax scheme. Judge Burrell asked me, well, you argued in Goodrich's case that somebody could believe it. Well, I represented Goodrich at that point. That was his defense, but the jury clearly found that you couldn't believe it, and Judge Burrell clearly found implicitly in this case that you can't believe that. Clearly, Peters was committing a crime when you prepared those tax returns. I see you're over time. I see that. It's going up again, Your Honor. Thank you. Mr. Lapham. Thank you, Your Honor. Good morning. My name is Steve Lapham. I'm an assistant U.S. attorney in Sacramento, and I was the trial attorney on the case. It's good to see you all again. I want to start by addressing Mr. Locke's rendition of the facts in his argument this morning. Excuse me. He mentioned that Mr. Benz's theory was that he thought this was a loan and that there was nothing illegal about that. I want to point out to the Court, if it's not already clear, that that argument finds no support in the record but through Mr. Benz's testimony. There is no evidence or there are no documents supporting that theory, and there is a lot of other testimony in the case that would dispute that, and not just through Mr. Peters' testimony. This is not a case of whether you believe Mr. Peters or Mr. Benz. Dr. Chan said that he testified uncategorically, that he never said he was going to loan Mr. Benz $247,000, nor that he was going to invest that amount of money in some kind of investment. Mr. Atkins, the controller of the company, testified that he had conversations with Mr. Benz asking for an accounting of where did this $247,000 come from. And Mr. Benz always was evasive, gave contradictory and inconsistent answers. It was a loan from partners. It was a contribution from partners. Never once ever mentioned any kind of loan from Dr. Chan or RC Investments or anything of this sort. And not to put too fine a point on it, but Mr. Locke's argument is that Mr. Peters is simply a liar and a cheat. And he talks about my office's defense in this court of the Gaskell and Chappelle case, in which we argued that no person in his right mind would believe that this is not a fraud. I think I heard that argument, and you did argue that. Yes, we did. Rather forcefully and successfully for the most part. And I think that argument would have some merit with reference to Mr. Peters if there was evidence that Mr. Peters knew what Mr. Gaskell and Mr. Chappelle knew. But there is no evidence of that. I thought your theory in that case, though, that it was obvious to everybody what they were up to. Well, it was obvious to everyone who had knowledge of the scheme. Mr. Peters had half of the picture. Mr. Chappelle knew that that money was generated in the United States, was going offshore, was being transferred around from place to place, and then magically came back onshore. Mr. Peters didn't have that full picture. At least there's nothing in the record to suggest he did. And he denied it in the grand jury that he realized what was going on. He testified that he had been- It certainly would have been fruitful cross-examination material, though, wouldn't you say? Yes. And I concede that point. I think it would have been a lively cross-examination. But then you get to the bottom line. Would it, at the end of the day, ultimately have resulted in a verdict different than the one that we ultimately got? And that's- It certainly would, from the defendant's point of view, have been a fairer trial, don't you think? Your Honor, if I had it to do over again, I wish it had been disclosed up front, because I think we could have argued this in a motion in limine rather than in this court. I think in the final analysis what would have happened is that Judge Burrell would have looked at this, would have examined the matter under Rules 404B and associated rules, and he would have said this goes too far afield. I think there's a greater likelihood this would or would not occur in the future if we affirm or reverse. Well, I- In other words, how do we get prosecutors to do this, to look at something and say, you know, this may be close, but it's close enough to Brady that I'm going to give it to him, and maybe I can keep it out, maybe it produces some cross-examination, but I'd rather do that than stand in courtroom one in San Francisco in front of the Ninth Circuit and have them pester me about why I didn't produce it. Your Honor, in my own defense, I am very much in favor of open-file discovery. I looked at this transcript, and perhaps it was because I didn't have a very good understanding of the Gaskell and Chappelle case at the time, it wasn't my case. And in fact, I came into this case, the Benz case, only as the trial attorney. And I looked at that transcript. Mr. Peters seemed to know nothing about nothing. Most of the transcript dealt with his rendition of documents that came into his possession through other sources that he did not generate. And he testified that he had no, as far as I could tell from this transcript, that he had no knowledge of the scheme. All right, but really the thrust of your argument in the prior appeal was that no reasonable person could look at this offshore scheme and conclude that it had any legitimate basis or purpose. If Mr. Peters knew what this offshore scheme was about, but he never attended any seminar or lecture or presentation where this offshore scheme was discussed. He prepared a tax return for physicians, right? Correct. Who earned $300,000 to $400,000 a year. And what amount of taxes did these people pay? I don't know the answer to that question. I thought it was none. Right? It was none? It was very small. It seemed to none, but very small. And one of them actually got the earned income credit back with his discussion about that. It means he not only didn't pay anything, he got money back. Okay. You're all right. Again, if I had it to do over again, I wish we could have been arguing about this in the district court because I think it would have been a win for the government. I don't think this evidence would have come in. I'd like to, so in answer to your question, I think obviously if you reversed in this case, that would send a signal to prosecutors, I don't think this is the right case to send that signal because this evidence simply would not have made a difference at the end of the day. And that's the final point I'd like to address. The defense theory, as I understand it, is that Leonard Peters, this was his scheme from start to finish, not Mr. Benz's scheme, not that they conspired together, but this was Peters only from start to finish. Well, that's a tough sell, I think, in any circumstances because this was not Mr. Peters' company that was in financial difficulty, and Mr. Peters is not the one who profited from this. And this is a point I raised in my brief. The scheme never got off the ground. Dr. Chan gave that money back immediately. At that point, there is no longer any motive for Mr. Peters to keep up this charade and keep trying to convince Mr. Benz that this was in fact some kind of loan-back situation. So it's hard to understand the defense theory under any circumstances, but in this case there is a lot of other corroborating information that Mr. Benz was robbing the pension fund well before Mr. Peters even came into the picture with the $247,000, months before Mr. Benz had stolen his partner's pension money and then dummied up documents. The specific document, and this will be my last point that I know the Court is aware of, are those corporate minutes. They're signed by the three partners. Two of the three say it's absolute fraud, and it has to be fraud because that $247,000 figure didn't become available for another six weeks. This is not a case of he said, she said. This is a case where Mr. Benz's case was overwhelming. Thank you. Thank you. Give me 15 seconds. That's all I need, Your Honor. Yesterday I found a case which is United States v. Hugo Cruz Garcia, which was decided by the Ninth Circuit on September 17th by Judge Kaczynski. I told the government about it yesterday when I found out about it. It has a discussion of 404B that I think is relevant if you get to that analysis in this case. Thank you. Okay, thank you. The case just argued will be submitted, and the Court will stand adjourned. Thank you.
judges: Hawkins, Thomas, Clifton